IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | NO. 7:17-CR-00128 |
| ROGELIO RAMOS, JR. | |

## RESPONSE TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

The United States of America asks the Court to deny the defendant's compassionate-release motion, which is based on COVID-19 concerns, for the reasons that follow.

**1.   Factual Background**

The Defendant, Rogelio Ramos, Jr., was indicted on a single count indictment on January 31, 2017. Mr. Ramos was charged with wire fraud under Title 18, United States Code, Sections 1343 and 1349 for his role in a "second chance" mortgage fraud scheme operating in Hidalgo, Harris, and Bexar counties. On May 26, 2017, Mr. Ramos was convicted by a jury on the sole count of the indictment. He was sentenced December 14, 2017 to 90 months of custody followed by a term of five years of supervised release along with restitution ordered in the amount of $1,858,996.75 to the ninety-nine identified victims who lost money during the fraud scheme. Following pronouncement of the sentence, Mr. Ramos filed his notice of appeal on December 22, 2017.

On January 24, 2020, a divided panel of the Fifth Circuit Court of Appeals issued an opinion vacating the conviction and remanding the case back to the trial court. The Government filed a petition for rehearing on February 28, 2020. On March 2, 2020, the

Fifth Circuit panel requested that Defendant's counsel, Terry Canales, file a response to the Government's petition for panel rehearing. Mr. Canales filed the reply to the Government's petition on March 11, 2020. Since that date, no further action has been taken by the Fifth Circuit panel and no mandate has issued from the Fifth Circuit Court of Appeals. The petition thus remains pending.

Mr. Ramos is currently incarcerated in the Three Rivers Federal Correctional Institution. On April 27, 2020, in response to a request from the Government, the Camp Administrator, Rhonda Domas, informed the Government that Ramos had not exhausted his administrative remedies with the Bureau of Prisons.

## 2. Argument and Authorities

To file a compassionate-release motion in this Court, the defendant must first exhaust administrative procedures. Because he has not done that, this Court must dismiss his motion. Under 18 U.S.C. § 3582(c)(1)(A), a court may reduce a term of imprisonment upon finding "extraordinary and compelling circumstances," consistent with guideline policy statements. Under the statute as amended by the First Step Act, the Court may act "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *See id.*

The defendant has moved for compassionate release based on concerns about COVID-19. Consistent with the First Step Act, the defendant should first present his

request to the BOP, permitting it to evaluate the inmate's current circumstances in light of the coronavirus concerns. He cannot petition for judicial relief until, as the statute provides, the BOP denies the request or 30 days have passed after presentation of the request to the warden, whichever is earlier. Because he has not yet exhausted administrative remedies, this Court should dismiss his motion. *See United States v. Eberhart*, No. 13-cr-00313, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) (holding, in a case involving a compassionate-release motion based on COVID-19 concerns, "[b]ecause defendant has not satisfied the exhaustion requirement, the court lacks authority to grant relief under § 3582(c)(1)(A)(i).").

Alternatively, the defendant's motion fails on the merits, for three reasons. First, his COVID-related concerns do not constitute extraordinary and compelling reasons under the compassionate-release statute. Section 3582(c)(1)(A) provides that any reduction must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Here, the applicable policy statement, USSG § 1B1.13, provides no basis for a sentence reduction based on COVID-19. Rather, the policy statement allows a reduction for "extraordinary and compelling reasons" only if the reasons are "consistent with this policy statement." USSG §§ 1B1.13(1)(A) & (3). Application note 1 to the policy statement then explains that "extraordinary and compelling reasons exist under any of the circumstances set forth below," which include only (a) a defendant suffering from a terminal illness or other medical condition "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; (b) a defendant at least 65

years old who "is experiencing a serious deterioration in physical or mental health because of the aging process" and "has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less"; (c) a defendant who has minor children without a caregiver or with an incapacitated spouse or partner who needs the defendant to be the caregiver; or (d) "[a]s determined by the Director of the Bureau of Prisons, . . . an extraordinary and compelling reason other than, or in combination with, the [above] reasons." USSG § 1B1.13, comment. (n.1).

With regard to the last consideration relating to extraordinary and compelling reasons the Director of the BOP has identified, BOP has issued a regulation defining its own consideration of compassionate-release requests. *See* BOP Program Statement 5050.50, *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. This program statement was amended effective January 17, 2019, following the First Step Act's passage. It sets forth in detail BOP's definition of the circumstances that may support a request for compassionate release, limited to the same bases the Sentencing Commission identified: serious medical condition, advanced age, and family circumstances.[1]

Neither the policy statement nor the BOP regulation provides any basis for compassionate release based on general COVID-19 concerns. Rather, the grounds for compassionate release the Commission identified are all based on inherently individual

---

[1] The defendant might argue that the policy statement is only advisory, but that is incorrect. The policy statement is binding under the express terms of Section 3582(c)(1)(A), and because it concerns only possible sentence reductions, not increases, it is not subject to the rule of *Booker v. United States*, 543 U.S. 220 (2005), that any guideline that increases a sentence must be deemed advisory. *See Dillon v. United States*, 560 U.S. 817, 830 (2010) (making clear that the statutory requirement in Section 3582 that a court heed the restrictions stated by the Sentencing Commission is binding).

circumstances—health, age, and family responsibilities—and, not surprisingly, nothing remotely comparable to the general COVID-19 concerns that thousands of offenders could cite in compassionate-release motions. On this basis, at least one district court has already denied a defendant's compassionate-release motion. *See United States v. Eberhart*, No. 13-cr-00313, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("As defendant does not assert that he is suffering from a medical condition as defined in U.S.S.G. § 1B1.13, a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A).").

Second, even if COVID-19 concerns were to qualify as extraordinary and compelling circumstances under the policy statement, the defendant has not shown that the BOP is incapable of managing the situation such that release is warranted. The BOP is monitoring the situation on a daily—even hourly—basis, and it has taken aggressive action to mitigate any health risks for prisoners.[2]

BOP has been planning for potential COVID-19 transmissions since January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization. On March 13, 2010, BOP announced that it was implementing a Phase Two Action Plan to minimize the risk of COVID-19 transmission

---

[2] The following information comes from https://www.bop.gov/resources/news/20200313_covid-19.jsp and https://www.bop.gov/coronavirus/index.jsp.

into and inside its facilities. The Action Plan comprises several preventive and mitigation measures, including the following:

<u>Screening of Inmates and Staff:</u> All new BOP inmates are screened for COVID-19 symptoms and risk of exposure. Asymptomatic inmates with a documented risk of exposure will be quarantined; symptomatic inmates with documented risk of exposure will be isolated and tested pursuant to local health authority protocols. In areas with sustained community transmission and in medical referral centers, all facility staff will be screened for self-reported risk factors and elevated temperatures.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g., medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the BOP Deputy Director. Any contractor or volunteer who requires access will be screened using the same procedures as applied to staff prior to entry.

<u>Suspension of Social Visits and Tours:</u> BOP has placed a 30-day hold on all social visits, such as visits from friends and family, to limit the number of people entering the facility and interacting with detainees. To ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended for at least the first 30 days that the Action Plan is in effect.

<u>Suspension of Legal Visits:</u> BOP has also placed a 30-day hold on legal visits, though such visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

**Response to Compassionate-Release Motion – Page 6**

<u>Suspension of Inmate Movements:</u> With limited exceptions, BOP has also ceased the movement of inmates and detainees among its facilities, and all inmates who are set to be moved are first being screened for COVID-19 symptoms. This will prevent transmissions between institutional populations. Likewise, all official staff travel has been cancelled, as has most staff training.

<u>Modified Operations:</u> The Action Plan requires wardens at BOP facilities to modify operations in order to maximize social distancing. Among the possible actions are staggering of meal times and recreation time.

Taken together, these measures are designed to sharply mitigate the risks of COVID-19 transmission in a BOP institution. BOP professionals will continue to monitor this situation and adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Moreover, per the Attorney General's instruction, the BOP is also prioritizing the use of BOP's various statutory authorities (such as 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541(g)) to grant home confinement in appropriate circumstances for inmates seeking transfer in connection with COVID-19.[3] Per this procedure, if the defendant is statutorily eligible for home confinement and meets certain other criteria, before the BOP grants discretionary release, a BOP Medical Director will "make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility,

---

[3] This information comes from the publicly available memorandum from the Attorney General to the BOP Director, available at https://www.justice.gov/file/1262731/download.

as well as the risks of COVID-19 at the location at which the inmate seeks home confinement."

Finally, Ramos has argued that he is uniquely entitled to release because of the divided panel of the Fifth Circuit vacated and remanded his case. As previously mentioned in the Factual Background, the Government has filed a Petition for Panel Rehearing before the Fifth Circuit and that petition is still pending. As a result, the mandate from the Fifth Circuit has not issued. *See* Fed. R. App. 41(d). An appellate court's decision is not final until its mandate issues. As such, Ramos' conviction and judgment remain in full effect. *E.g., United States v. Cook*, 592 F.2d 877, 880 (5th Cir. 1979); *United States v. Rivera*, 844 F.2d 916 (2nd Cir. 1988). The pending appeal should have no impact on his motion for release.

Given all of the above, judicial action is unnecessary—and, in fact, it would be detrimental to this process as it would inevitably result in scattershot treatment of inmates in contravention to the BOP's organized, comprehensive approach of granting home confinement under consistent criteria to eligible inmates in its custody. As just outlined, the BOP is also employing practices to keep the prison population at low risk for COVID-19 spread. Accordingly, the government opposes judicial action in individual cases such as this.

The Fifth Circuit has already denied prisoners' motions for bail pending appeal that rested on COVID-19 concerns. *See United States v. Anderson*, Fifth Cir. No. 19-10963 (3/19/20 & 3/23/20 orders). District courts in other districts have also denied similar motions. *See, e.g., United States v. Gileno*, No. 3:19-cr-161, 2020 WL 1307108 (D. Conn.

Mar. 19, 2020); *United States v. Cohen*, No. 18-cr-602, 2020 WL 1428778 (S.D.N.Y. Mar. 24, 2020). As the *Gileno* court reasoned:

> With regard to the COVID-19 pandemic, Mr. Gileno has . . . not shown that the plan proposed by the Bureau of Prisons is inadequate to manage the pandemic within Mr. Gileno's correctional facility, or that the facility is specifically unable to adequately treat Mr. Gileno. The Court takes judicial notice of the fact that public health recommendations are rapidly changing. But at this time the Court cannot assume that the Bureau of Prisons will be unable to manage the outbreak or adequately treat Mr. Gileno should it emerge at his correctional facility while he is still incarcerated.

*Id.* at *4 (citation omitted).

This Court should reach the same conclusion here and deny the defendant's compassionate-release motion.

Respectfully submitted,

RYAN K. PATRICK
UNITED STATES ATTORNEY

_____
Robert L. Guerra, Jr.
Assistant United States Attorney
1707 W. Bus. US Highway 83
Suite 600
Tel: 956-618-8010
Email: Robert.Guerra@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2020, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court. I also mailed a paper copy to Rogelio Ramos, Jr. at FCI Three Rivers – Federal Correction Institution, P.O. Box 4200, Three Rivers, Texas 78071.

_____
Robert L. Guerra, Jr.
Assistant United States Attorney